UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:14-CV-743-TBR

MARGARET WILSON, individually
and on behalf of a Class of persons
similarly situated,                                                          PLAINTIFF

v.

ANTHEM HEALTH PLANS OF
KENTUCKY, INC.,                                                             DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on two pending motions. First, Plaintiff Margaret Wilson

filed a Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. [DN 37.]

Defendant Anthem Health Plans of Kentucky, Inc. ("Anthem") responded. [DN 41.] Plaintiff

replied. [DN 44.] Second, Plaintiff filed a Motion to Strike Undisclosed Evidence and

Testimony. [DN 43.] Defendant responded. [DN 45.] No replies were filed. Fully briefed, these

matters are now ripe for adjudication. For the reasons stated herein, the Court will GRANT

Plaintiff's Motion for Class Certification and DENY Plaintiff's Motion to Strike as moot.

## BACKGROUND

Plaintiff Wilson is the mother of M.W., a minor child with Autism Spectrum Disorder

("ASD"). [DN 1 at 1–2.] Both Wilson and M.W. are beneficiaries under a health benefit plan

provided by Defendant Anthem (the "Anthem Plan") under ERISA. [*Id.*] To obtain treatment for

M.W.'s ASD, Wilson and M.W. have travelled to several different states and internationally. [*Id.*

at 10.] In 2009, when M.W. was twelve years old, Wilson and M.W. moved back to Kentucky

from Georgia, where they had been living to obtain treatment for M.W.'s ASD, and enrolled

M.W. in a treatment program at a new facility in Prestonburg, Kentucky. [*Id.*] The facility, called

the Highlands Center for Autism, offers a type of treatment known as Applied Behavior Analysis

("ABA"), a well-recognized treatment for ASD. [*Id.* at 3; 10–11.] M.W. received treatment at the

Highlands Center until Spring 2014, during which time he "received appropriate care and

experienced significant progress in communication, cognition, and activities of daily living." [*Id.*

at 11.] Wilson submitted claims to Anthem seeking coverage for M.W.'s treatment, and was

reimbursed some amounts, but "the vast majority of the cost of that treatment has gone

unreimbursed." [*Id.*] Wilson further claims that Anthem limited coverage of claims for treatment

M.W. received from other sources after leaving the Highlands Center and that, in total, Wilson

has been denied "tens of thousands of dollars" in reimbursements. [*Id.*]

The Anthem Plan does provide coverage for ASD and ABA treatment, but places

limitations on that coverage. The Anthem Plan states, in relevant part:

> The diagnosis and treatment of Autism Spectrum Disorders for Members ages one (1) through twenty-one (21) is covered. Autism Spectrum Disorders means a physical, mental, or cognitive illness or disorder which includes any of the pervasive developmental disorders as defined by the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") published by the American Psychiatric Association, including Autistic Disorder, Asperger's Disorder, and Pervasive Developmental Disorder Not Otherwise Specified.

> Treatment for autism spectrum disorders includes the following care for an individual diagnosed with any of the autism spectrum disorders:

> \*\*\*
> - Applied behavior analysis prescribed or ordered by a licensed health or allied health professional. Applied behavior analysis means the design, implementation, and evaluation of environmental modifications, using behavioral stimuli and consequences, to produce socially significant improvement in human behavior, including the use of direct observation, measurement, and functional analysis of the relationship between environment and behavior

[DN 1-1 at 26–27.] Other ASD treatments identified in the Anthem Plan in addition to ABA include medical care, habilitative or rehabilitative care, pharmacy care, psychiatric care, psychological care, and therapeutic care. [*Id.* at 27.]

The Anthem Plan limits coverage for ASD treatment to 1,000 hours per year for members ages one through their seventh birthday and 20 hours per month for members ages seven through twenty-one. [*Id.* at 15.] It is these hour limitations, in addition to similar dollar limitations Anthem places on ASD treatment coverage, that Wilson contends are unlawful under the Employee Retirement Income Security Act of 1974 ("ERISA") and the Mental Health Parity and Addiction Equity Act ("MHPAEA"). [DN 1 at 1; DN 38 at 1.]

"Congress enacted the MHPAEA [in 2008] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016) (citing *Coalition for Parity, Inc. v. Sebelius,* 709 F.Supp.2d 10, 13 (D.D.C. 2010)). The 2008 statute "expanded the scope of prior legislation, the Mental Health Parity Act of 1996." *Id.* The MHPAEA provides, in part:

**(2) Annual limits**

In the case of a group health plan or a health insurance issuer offering group or individual health insurance coverage that provides both medical and surgical benefits and mental health or substance use disorder benefits—

**(A) No annual limit**

If the plan or coverage does not include an annual limit on substantially all medical and surgical benefits, the plan or coverage may not impose any annual limit on mental health or substance use disorder benefits.

**(B) Annual limit**

If the plan or coverage includes an annual limit on substantially all medical and surgical benefits (in this paragraph referred to as the "applicable annual limit"), the plan or coverage shall either—

**(i)** apply the applicable annual limit both to medical and surgical benefits to which it otherwise would apply and to mental health and substance use disorder benefits and not distinguish in the application of such limit between such medical and surgical benefits and mental health and substance use disorder benefits; or

**(ii)** not include any annual limit on mental health or substance use disorder benefits that is less than the applicable annual limit.

 ***

**(3) Financial requirements and treatment limitations**

**(A) In general**

In the case of a group health plan or a health insurance issuer offering group or individual health insurance coverage that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that—

***

**(ii)** the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

42 U.S.C. § 300gg-26(2); (3)(A)(ii). Examples of "[t]reatment limitations include: 'limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment.'" *Smith v. U.S. Office of Pers. Mgmt.*, 80 F. Supp. 3d 575, 578–79 (E.D. Pa. 2014) (quoting 42 U.S.C. § 300gg–26(a)(3)(B)(iii)). "Congress enacted the [MHPAEA] as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3) as a violation of a 'provision of this subchapter.'" *Joseph F. v. Sinclair Servs. Co.*,

4

158 F. Supp. 3d 1239, 1259 n.118 (D. Utah 2016) (citing *A.F. ex rel. Legaard v. Providence Health Plan*, 35 F.Supp. 3d 1298, 1304 (D. Or. 2014); 29 U.S.C. § 1132(a)(3)(A)–(B)).

Wilson alleges that the Anthem Plan does not impose limitations on medical and surgical benefits as it does for ASD, and therefore that the limitations the Anthem Plan places on ASD treatment violate the MHPAEA. [DN 1 at 5–7.] Accordingly, in the instant motion, Wilson seeks certification of the following class of individuals:

> All persons who are or have been insureds, participants in, or beneficiaries of a health insurance policy issued or administered by Anthem Health Plans of Kentucky, Inc., which contains dollar limits on the provision of treatment for Autism Spectrum Disorders and who have made a claim for, and have been denied coverage or reimbursement for Applied Behavior Analysis treatment for Autism Spectrum Disorders on the grounds that the policy's dollar limits had been exceeded.

[DN 38 at 2.]

Anthem vigorously opposes class certification, however, making, in essence, two main arguments in response: 1) "under state and federal law, ASD may or may not be a mental health condition, depending on the individual," and 2) "whether ABA therapy is a 'mental health benefit' is also not a question that could be answered on a class-wide basis" bur rather requires individualized determinations based upon each individual's treatment plan. [DN 41 at 29; 31.] At the core of each of these arguments is the assertion that this case presents overwhelmingly individual issues so as to make a class action an improper method for resolving this dispute. The Court will address these arguments in detail below.

## STANDARD

"A district court has broad discretion to decide whether to certify a class." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996)). "Class certification is

appropriate if the court finds, after conducting a 'rigorous analysis,' that the requirements of Rule 23 have been met." *Id.* at 851 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)). In conducting such an analysis, courts must bear in mind that class certification is an "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Davis v. Cintas Corp.*, 717 F.3d 476, 483 (6th Cir. 2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)).

In order to obtain certification, "a class must satisfy all four of the Rule 23(a) prerequisites—numerosity, commonality, typicality, and adequate representation—and fall within one of the three types of class actions listed in Rule 23(b)." *Young*, 693 F.3d at 537 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc)). The four prerequisites to certification "serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members." *In re Whirlpool Corp.*, 722 F.3d at 850 (citing *Dukes*, 564 U.S. at 347–48). It is the party moving for certification that "has the burden to prove the Rule 23 certification requirements." *Young*, 693 F.3d at 537 (citing *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079). A district court's decision whether to certify a class action "will be reversed only if a strong showing is made that the district court clearly abused its discretion." *Id.* at 536 (citing *Olden v. LaFarge Corp.*, 383 F.3d 495, 507 (6th Cir. 2004)).

DISCUSSION

As explained above, Wilson alleges that Anthem places limits on its coverage of ABA treatment for ASD and that such limitations violate the MHPAEA, which prohibits insurance companies from providing less favorable coverage for mental health benefits than it does for

6

medical or surgical benefits. *See* 42 U.S.C. § 300gg-26. Plaintiff asserts that class certification is appropriate both under Rules 23(b)(2) and 23(b)(3). [DN 38 at 22.] To qualify for certification under either of these subsections, however, Plaintiff must first demonstrate the satisfaction of Rule 23(a)'s prerequisites. *See In re Whirlpool Corp.*, 722 F.3d at 850; Fed. R. Evid. 23(a).

## I.      Rule 23(a) Prerequisites to Class Certification

Rule 23(a) states, in relevant part:

> **Prerequisites.** One or more members of a class may sue . . . as representative parties on behalf of all members only if:
>
> **(1)** the class is so numerous that joinder of all members is impracticable;
>
> **(2)** there are questions of law or fact common to the class;
>
> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The Court will address each of the four prerequisites in turn.

### 1.   Numerosity

In order to satisfy Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." *Id.* at 23(a)(1). Although "no strict numerical test exists to define numerosity under Rule 23(a)(1), 'substantial' numbers of affected consumers are sufficient to satisfy this requirement." *In re Whirlpool Corp.*, 722 F.3d at 852 (citing *Daffin,* 458 F.3d at 552). Moreover, "impracticability of joinder must be positively shown," and "mere speculation as to the number of parties involved is not sufficient to satisfy Rule 23(a)(1)." *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005) (quoting 7A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1762 (3d ed. 2001)). However, "numbers are not a perfect predictor. Rather than naming a specific number, Rule 23 places the size of the class in the

context of actual impracticability of joinder." *Turnage v. Norfolk S. Corp.*, 307 Fed. App'x 918, 921 (6th Cir. 2009). Therefore, "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079 (quoting *General Tel. Co. v. EEOC,* 446 U.S. 318, 330 (1980)).

With regard to class size, "the Supreme Court has stated in *dicta* that a class of fifteen was 'too small to meet the numerosity requirement.'" *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 250 (3d Cir. 2016), *as amended* (Sept. 29, 2016) (citing *Gen. Tel. Co.*, 446 U.S. at 331. Additionally,

> [l]eading treatises have collected cases and recognized the general rule that "[a] class of 20 or fewer is usually insufficiently numerous ... [a] class of 41 or more is usually sufficiently numerous.... [while] [c]lasses with between 21 and 40 members are given varying treatment. These midsized classes may or may not meet the numerosity requirement depending on the circumstances of each particular case. 5 James Wm. Moore, et al., *Moore's Federal Practice* § 23.22; *see also* 5 William B. Rubenstein, *Newberg on Class Actions* § 3:12 ("As a general guideline ... a class that encompasses fewer than 20 members will likely not be certified absent other indications of impracticability of joinder, while a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone." (internal footnotes omitted)); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (3d Cir. 1986) (citing Moore favorably).

*Id.* at 250. *See also Guy v. Lexington-Fayette Urban Cty. Gov't*, 488 F. App'x 9, 22 (6th Cir. 2012) ("A class of twenty or fewer is usually insufficiently numerous.").

Courts may consider a variety of factors in evaluating, under the specific facts of each case, whether joinder is impracticable. Such factors may include:

> (1) judicial economy arising from the avoidance of a multiplicity of actions; (2) the geographic dispersion of class members; (3) the financial resources of class members; (4) the ability of claimants to institute individual lawsuits; (5) the amount of each member's individual claim; (6) knowledge of the names and existence of the potential class members; and (7) whether potential class members have already joined other actions.

*Powell v. Tosh*, 280 F.R.D. 296, 303 (W.D. Ky. 2012), *on reconsideration*, No. 5:09-CV-121, 2012 WL 2601946 (W.D. Ky. July 5, 2012) (quoting *Primavera Familienstiftung v. Askin,* 178 F.R.D. 405, 410 (S.D.N.Y. 1998)).

Wilson states in her reply that, "[a]fter the recent data production, the class is now about 27 class members." [DN 44 at 6.] This is an increase from the 12 putative members Plaintiffs identified in her initial motion. [DN 38 at 16–17.] Wilson acknowledges the relatively small class size at issue in this case, but contends that, without certification, "it is highly unlikely that other members would bring their own case or even know about Anthem's illegal benefit caps. Additionally, deciding this issue in this case would resolve this issue for all affected individuals and would avoid the filing of separate lawsuits throughout the state." [*Id.* at 17.] Moreover, Wilson argues that, as the putative class has already increased from 12 to 27 members, the likelihood that the class will continue to increase in the future makes joinder impracticable and therefore weighs in favor of finding the numerosity requirement satisfied. [DN 44 at 6.]

Anthem argues, conversely, that a class of 27 members "is far too small and [is] capable of being effectively addressed with individual lawsuits." [DN 41 at 24.] According to Anthem, a consideration of the relevant factors demonstrates that joinder of 27 class members is not impracticable in this case, and Wilson has failed to carry her burden of demonstrating as much. [*Id.* at 24–28.]  The Court disagrees.

### a.  Judicial Economy

Anthem first asserts that resolving this case as a class action will not serve judicial economy "by avoiding a multiplicity of actions, as no putative class member currently has a claim pending against Anthem relating to the Autism Mandate caps and none are likely." [DN 41 at 25.] This is not the relevant inquiry with regard to judicial economy, however. The judicial

economy factor "looks to the administrative burden that multiple or aggregate claims place upon the courts." *In re Modafinil Antitrust Litig.*, 837 F.3d at 254 (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012)). A consideration of judicial economy "takes into account any efficiency considerations regarding the joinder of all interested parties that the district court deems relevant, including the number of parties and the nature of the action." *Id.* This includes an analysis of "'the actual, practical difficulties of joining all of the potential class members' by inquiring whether joinder 'would be expensive, time-consuming, and logistically unfeasible.'" *Id.* (quoting 5 *Moore's Federal Practice* § 23.22). In other words, this analysis "primarily involves considerations of docket control, taking into account practicalities as simple as that of every attorney making an appearance on the record." *Id.* at 257.

Here, the Court is persuaded that an analysis of judicial economy considerations weighs in favor of finding the numerosity prerequisite satisfied.  In this case, as Wilson points out, joinder of all 27 putative class members could potentially require the filing of separate lawsuits "throughout the state." [DN 38 at 17.] Moreover, joinder of 27 parties into a single lawsuit would present several administrative complexities for the Court, rendering it highly impracticable to hold telephonic conferences, manage the electronic docket, and make scheduling decisions to the satisfaction of all parties. It would additionally put on this Court the "the burden of having to decide numerous, sufficiently similar individual actions *seriatim*." *In re Modafinil Antitrust Litig.*, 837 F.3d at 252 (citing *Marcus,* 687 F.3d at 594–95). Specifically, because the core claim for each class member is essentially the same—whether Anthem's limitations on coverage for ABA therapy violate the MHPAEA—the Court is persuaded that a class action is "a substantially more efficient use of judicial resources than joinder of the parties at the onset of the litigation." *Id.* at 257.

**b.  Knowledge of The Names and Existence of Class Members and Amount of Each Member's Claim**

Anthem further asserts that because Wilson "possesses the contact information of each putative class members (as it was produced to Plaintiff in discovery) . . . there is no practicability barrier to joining them in the present lawsuit under Fed. R. Civ. P. 20(a)." [DN 41 at 25.] Indeed, this factor may weigh in favor of finding practicability of joinder. However, the Court has concerns about Wilson and her counsel's ability to contact such individuals in light of the Agreed Protective Order in effect in this case [DN 36] and ethical issues that may arise as a result of contacting individuals to notify them of potential claims relating to personal medical information.

Even assuming there are no confidentiality or ethical issues with contacting putative members, however, other factors still weigh in favor of numerosity. Anthem asserts that "class members have the means and incentives to bring their own claims: Plaintiff's claim alone is allegedly worth 'tens of thousands of dollars' . . . , and ERISA's feeshifting provision means that any individual member can bring his or her own claim." [DN 41 at 26 (citing 29 U.S.C. § 1132(g)(1)).] The Court is not persuaded, however, that ERISA's provision for an award of a "reasonable attorney's fee and costs of action," 29 U.S.C.A. § 1132(g)(1), is sufficient to remove any financial bar to bringing suit. The mere fact that a prevailing party may be entitled to attorney's fees and costs under ERISA does nothing to ease the concerns of a party contemplating a lawsuit who is uncertain whether or not they will prevail. Moreover, Wilson points out that merely because a "significant amount" of her claims were denied does not mean that "all other members of the class are in a similar position." [DN 44 at 11.] Rather, "as indicated by the doubling of the class size in about a year, a number of individuals have come into the class recently and have not incurred a significant number of capped claims." [*Id.*]

Accordingly, the Court is unpersuaded that, as Anthem claims, "class members have the means and [financial] incentives to bring their own claims" sufficient to defeat a finding of numerosity. [DN 41 at 26.]

### c. The Ability of Claimants to Institute Individual Lawsuits and Whether Potential Class Members Have Already Joined Other Actions

Wilson further argues in her Reply that the numerosity factors which look to the ability of class members to bring individual lawsuits and whether class members have already pursued other actions "indicate that what should be considered is whether the class members understand and can prosecute their claims themselves." [DN 44 at 5.]  To that point, Wilson argues that the claim asserted in this case "is not easily understood by class members," and not only that, but "presumably even if a class member called the [Kentucky] Department [of Insurance] he or she would be told that the limits" on ABA coverage are unassailable" because of the Department's decision to enforce of the very treatment limitations Wilson challenges. [*Id.* at 6.] Moreover, both Wilson and Anthem acknowledge that no other actions by class members are currently pending against Anthem and even Anthem acknowledges that "none are likely." [DN 41 at 16.] The Court agrees, as Wilson points out, that a primary reason no other suits are likely is because "class members would have little knowledge of the availability of a claim regardless of whether they had the financial resources to pursue the claim." [DN 44 at 6.] Without knowledge of such claims, it can hardly be said that class members are fully "able" to institute their own lawsuits. Therefore, these factors, too, weigh in favor of finding numerosity.

Although Wilson possesses the names of potential class members and although the potential members are not widely-dispersed geographically, which may weigh in favor of finding a lack of numerosity, the Court is nonetheless persuaded that, on balance, a consideration of relevant factors compels a finding that the numerosity requirement is satisfied. In particular,

judicial economy and the ability of class members to institute separate lawsuits weigh in favor of such a finding here. *See In re Modafinil Antitrust Litig.*, 837 F.3d at 253 ("[J]udicial economy and the ability to litigate as joined parties are of primary importance.") Accordingly, the Court finds that Wilson has met her burden of demonstrating the satisfaction of this prerequisite.

### 2. Commonality

In order to satisfy Rule 23(a)(2), there must be "questions of law or fact common to the class." Fed. R. Evid. 23(a)(2). "To demonstrate commonality, the plaintiffs' 'claims must depend on a common contention ... of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Young*, 693 F.3d at 542 (quoting *Dukes*, 564 U.S. at 350). The Sixth Circuit recently explained that, "[i]n other words, named plaintiffs must show that there is a common question that will yield a common answer for the class (to be resolved later at the merits stage), and that that common answer relates to the actual theory of liability in the case." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 1493 (2016). Moreover, "there need be only one common question to certify a class." *In re Whirlpool Corp.*, 722 F.3d at 853 (citing *Sprague*, 133 F.3d at 397). *See also Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) " '[e]ven a single [common] question' " will do." (citation omitted)).

In this case, Wilson identifies the "overarching common question" of law for all class members as whether "Anthem [may] legally limit benefits for the treatment of ASD if it does not have similar limits for medical/surgical benefits." [DN 38 at 18.] Wilson argues that "[h]ere, answering the legal question of whether the MHPAEA preempts the [Kentucky] Autism Mandate and prohibits Anthem's visit limits is the 'glue' that holds the class claim together."

13

[DN 44 at 7 (quoting *Dukes*, 564 U.S. at 353).] Implicit in the question of whether Anthem's policy limitations violate the MHPAEA is another question of which Wilson seeks resolution in this case; that is, whether ASD is a "mental health condition." [DN 38 at 4.]

In response, Anthem contends that the question of whether ASD is a "mental health condition" under the MHPAEA "has no common answer because, under state and federal law, ASD may or may not me [sic] a mental health condition, depending on the individual." [DN 41 at 29.] As a result, Anthem argues, ABA may or may not constitute a "mental health benefit," "because each individual has a unique treatment plan that imparts in unique ways the benefits of occupational therapy, speech therapy, and behavior therapy services (*i.e.*, mental and non-mental health benefits)." [*Id.* at 11.] To address these arguments, an overview of the applicable Kentucky and federal statutory and regulatory language, in addition to the language used in the Anthem Plan, is necessary.

### a.  The MHPAEA and Accompanying Regulations

As discussed above, the MHPAEA prohibits insurance companies from imposing less favorable coverage limitations on "mental health benefits" than it does for "medical/surgical benefits." 42 U.S.C. § 300gg-26. The MHPAEA defines "mental health benefits" as "benefits with respect to services for mental health conditions, as defined under the terms of the plan and in accordance with applicable Federal and State law." *Id.* at § 300gg-26(e)(4). Accompanying regulations provide that

> [a]ny condition defined by the plan or coverage as being or as not being a mental health condition must be defined to be consistent with generally recognized independent standards of current medical practice (for example, the most current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), the most current version of the ICD, or State guidelines).

29 C.F.R. § 2590.712(a).

14

### b.  The KMHPA

The Kentucky Mental Health Parity Act ("KMHPA") states that "a health benefit plan . . . that provides coverage for treatment of a mental health condition shall provide coverage of any treatment for a mental health condition under the same terms or conditions as provided for treatment of a physical health condition." Ky. Rev. Stat. Ann. § 304.17A-661(1). The KMHPA defines "mental health condition" as

> any condition or disorder that involves mental illness or alcohol and other drug abuse . . . and that falls under any of the diagnostic categories listed in the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) or that is listed in the mental disorders section of the international classification of disease, or the most recent subsequent editions.

Ky. Rev. Stat. Ann. § 304.17A-660(1).

### c.  The Kentucky Autism Mandate

The Kentucky Autism Mandate (the "Autism Mandate"), which went into effect on January 1, 2011, requires insurance plans to provide certain mandatory minimum amounts of coverage for "individual[s] between the ages of one (1) through twenty-one (21) years of age . . . for the diagnosis and treatment of autism spectrum disorders." Ky. Rev. Stat. Ann. § 304.17A-142(1). The Autism Mandate defines "Autism spectrum disorders" as

> a physical, mental, or cognitive illness or disorder which includes any of the pervasive developmental disorders as defined by the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") published by the American Psychiatric Association, including Autistic Disorder, Asperger's Disorder, and Pervasive Developmental Disorder Not Otherwise Specified.

Ky. Rev. Stat. Ann. § 304.17A-141(3). It additionally defines "Applied behavior analysis" as "the design, implementation, and evaluation of environmental modifications, using behavioral stimuli and consequences, to produce socially significant improvement in human behavior, including the use of direct observation, measurement, and functional analysis of the relationship

15

between environment and behavior." *Id.* § 304.17A-141(1). Applied behavior analysis is additionally listed in the statute under "Treatment for autism spectrum disorders." *Id.* § 304.17A-141(11). The Anthem Plan defines ASD and ABA using language identical to that used in the Autism Mandate, and it similarly identifies ABA as a treatment for ASD. [*See* DN 1-1 at 26–27.]

### d. The DSM, ICD, and State Guidelines

The MHPAEA, the KMHPA, and the Autism Mandate each reference the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). As Wilson points out in her motion, Section II of the DSM covers "mental disorders" and the DSM indeed identifies ASD in Section II as a Neurodevelopmental Disorder. [DN 38-1 at 6–7.] The MHPAEA and the KMHPA additionally reference the International Classification of Disease ("ICD"), which, Wilson asserts in her motion, defines ASD as a "mental disorder." [*Id.* at 5–6.] Moreover, Wilson asserts that ASD is also a "mental health condition" pursuant to "State guidelines," specifically, under the KMHPA definition of "mental health condition." [*Id.* at 7.]

The crux of Anthem's argument, however, is that "State guidelines," specifically, the Autism Mandate's definition of ASD as "a *physical, mental, or cognitive* illness or disorder," is controlling here. [DN 41 at 29–31 (emphasis added).] Anthem contends that this definition demonstrates that ASD

> should not be categorized with a broad brush that ignores an individual's manifestation of the condition. These definitions acknowledge that an individual with autism could have physical, mental and/or cognitive issues, and thus, at least under Kentucky law and under the [Anthem] Plan, ASDs are not solely mental health issues.

[*Id.* at 17.] Anthem argues that because the federal regulations require the definition of "mental health condition" used in insurance plans to "be consistent with generally recognized independent standards of current medical practice," including the DSM, the ICD, *or* "State

16

guidelines," that the Kentucky Autism Mandate's definition of the term controls as prevailing

"State guidelines." *Id.*

> In her reply, Wilson argues:

>> Anthem has attempted to argue that whether ASD is a "mental health condition" under the MHPAEA is an individualized determination for each child. It is not.

>> Anthem has cited no cases in which ASD was found to be a ***medical*** condition -- that is, ***not*** a "mental health condition." Every other "generally recognized independent standard[] of current medical practice" considers ASD to be a mental health condition. 26 C.F.R. § 54.9812–1(a). These include the KMPHA, the Diagnostic and Statistical Manual of Mental Disorders (DSM), and the ICD. Anthem appears to argue that "State guidelines" as referenced – but not defined – by the MHPAEA incorporate the definition of ASD in the Autism Mandate . . . According to Anthem, because the Autism Mandate uses the word "physical" in the definition, ASD is necessarily at least partly a medical condition in Kentucky. But, Anthem ignores the fact that the KMHPA defines a "mental health condition" to clearly include ASD. K.R.S. § 304.17A-660(1). The Kentucky Department has also noted that autism benefits are just like "any other mental health benefits."

[DN 44 at 6–8.] As "Rule 23 grants courts no license to engage in free-ranging merits inquiries at

the certification stage," *Rikos*, 799 F.3d at 505 (quoting *Amgen Inc. v. Connecticut Ret. Plans &*

*Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013)), it would be improper for the Court to determine

at this time whether, as a matter of law, Wilson or Anthem's arguments are correct. It is true, as

the Supreme Court has acknowledged, that the Rule 23 analysis often "will entail some overlap

with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 564 U.S. at

351. But "[m]erits questions may be considered to the extent—*but only to the extent*—that they

are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

*Rikos*, 799 F.3d at 505 (quoting *Amgen Inc.,* 133 S.Ct. at 1194–95 (emphasis added)). *See also In*

*re Whirlpool,* 722 F.3d at 851–52 ("[D]istrict courts may not turn the class certification

proceedings into a dress rehearsal for the trial on the merits." (internal quotation marks omitted)).

The Court is persuaded that, here, Wilson has indeed identified at least one common question sufficient to satisfy the commonality requirement of Rule 23(a)(2): "whether the MHPAEA preempts the [Kentucky] Autism Mandate and prohibits Anthem's . . . limits" on ABA coverage. [DN 44 at 7.] This question "will yield a common answer for the entire class and . . . , if true, will make [Anthem] liable to the entire class." *Rikos.*, 799 F.3d at 506. The Court agrees that, based upon Wilson's arguments, she has "shown, for purposes of Rule 23(a)(2), that [she] *can prove*—not that [she] ha[s] already shown—that all members of the class have suffered the 'same injury.' *Id.* at 505 (quoting *Dukes,* 131 S.Ct. at 2551). Crucially, "[t]he Supreme Court in *Dukes* did not hold that named class plaintiffs must prove at the class-certification stage that all or most class members were in fact injured to meet this requirement." *Id.* Rather, Wilson must only show, at this stage, that the claims "'depend upon a common contention' that is 'of such a nature that it is *capable* of classwide resolution—which means that determination of its truth or falsity *will* resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Dukes*, 131 S.Ct. at 350). Wilson has met this burden. Whether Anthem's limitations on coverage of ASD treatment violate the MHPAEA is a question essential to the validity of each class members' claim. The resolution of this issue will therefore resolve, in one stroke, a central issue in the case.

Although Anthem indicates that it plans to defend on the basis of various individualized treatment plans particular to each class member, the fact that Anthem "will have some individualized defenses against certain policyholders . . . does not defeat the commonality requirement under the theory asserted by" Wilson. *Young*, 693 F.3d at 543 (citing *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988)). This case is analogous to *Young v. Nationwide Mutual Insurance Company*. In *Young*, Plaintiffs were policyholders of plans issued

by defendant insurance companies. *Young*, 693 F.3d at 535. Plaintiffs alleged that defendants improperly assessed them a local government tax, and that the improper charges were the result of defendants' failure to use appropriate preventative practices, such as a specific type of software. *Id.* at 543. Defendants argued that "they d[id] not have a uniform institutional policy that affected the tax jurisdiction assignment of each policyholder," but rather "that misassignments result[ed] from factual circumstances unique to each individual policyholder." *Id.* at 542–43. Similarly, here, Anthem contends that each child's ABA therapy "may or may not be characterized as providing mental health benefits, depending on the treatment plan at issue." [DN 42 at 31.] However, as the Sixth Circuit explained in *Young*, such individualized defenses will not defeat commonality when the alleged "liability arose from a single course of conduct." *Id.* at 543 (citing *Sterling*, 855 F.2d at 1197).

### 3. Typicality

In order to satisfy Rule 23(a)(3), "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed. R. Evid. 23(a)(3). The Sixth Circuit has repeatedly noted that

> [c]ommonality and typicality "tend to merge" because both of them "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."

*Young*, 693 F.3d at 542 (quoting *Dukes*, 564 U.S. at 350 n.5). With regard to the typicality requirement, "many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Rikos*, 799 F.3d at 509 (quoting 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Fed. Prac. & Proc.* § 1764 (3d ed. 2005)).

19

Anthem argues, much like its arguments against a finding of commonality, that "the tailored nature of each putative class member's treatment plan for ABA therapy means that no claim (including Plaintiff's) could be 'typical' of the class." [DN 41 at 32.] In support of this argument, Anthem references the treatment plans of various individuals who are members of the putative class, pointing out the unique treatment goals contained in each plan. [*Id.* at 32–33.] Anthem points out that one putative member's plan sought to "reduce problem behaviors such as self-injury, aggression and tantrums." [*Id.* at 23.] Another was aimed at "encouraging full-speech expression and promoting social interaction through sharing, taking turns, and communicating with other children." [*Id.*] Anthem contrasts this with M.W.'s treatment plan, which Anthem contends "stands out as particularly unlike those of the putative class members" because M.W. was nearing adulthood, was the oldest patient at the Highlands Center, and his treatment included vocational, career-based goals. [*Id.* at 23–24.] Finally, Anthem argues that Wilson's claim is not typical of the class because Wilson's mother paid for the cost of the ABA therapy that Anthem did not cover, and therefore that Wilson "herself does not have the same interest as the putative class members to litigate this case." [*Id.* at 24.] The Court disagrees.

In *Young*, the court explained that "[b]ecause Plaintiffs allege[d] both a single practice or course of conduct on the part of each Defendant—the failure to implement a geocoding verification system—that gives rise to the claims of each class member and a single theory of liability," the plaintiffs' claims were fairly characterized as typical of the class. *Young*, 693 F.3d at 543 (citing *In re Am. Med. Sys.,* 75 F.3d at 1082 ("[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.")). Here, Wilson alleges a single course of conduct on Anthem's part; that is, that Anthem caps benefits for ABA therapy, a

20

mental health benefit, as a treatment for ASD, a mental health condition, and that, because Anthem does not place corresponding limits on its coverage of medical benefits, this practice violates the MHPAEA. This single practice, Wilson alleges, gives rise to all of Anthem's alleged liability in this case, and that liability all stems from the same legal theory, the violation of the MHPAEA. Therefore, the fact that M.W. was "not a 'typical' patient," and that M.W.'s grandmother paid for the ABA therapy not covered by the Anthem Plan does not result in a lack of typicality. Rather, the fact that Wilson "had the same benefit limits applied to her expenses for the treatment of ASD . . . as other Class members," is sufficient for a finding that her claims are typical of the class under Rule 23(a)(3).

### 4.  Adequacy

In order to satisfy Rule 23(a)(4), the Court must find that " the representative parties will fairly and adequately protect the interests of the class." Fed. R. Evid. 23(a)(4). The Supreme Court has noted that the commonality and typicality requirements "also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Dukes*, 564 U.S. at 349 n.5 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 157–158 n.13 (1982)).

Specifically, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Young*, 693 F.3d at 543 (quoting *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625–26 (1997) (citations and internal quotation marks omitted)). The Sixth Circuit "looks to two criteria for determining adequacy of representation: '1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will

21

vigorously prosecute the interests of the class through qualified counsel.'" *Id.* (quoting *In re Am. Med. Sys., Inc.,* 75 F.3d at 1083 (citation omitted)). Additionally, courts must "review[] the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation." *Id.* (quoting *Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000)). *See also Cross v. Nat'l Trust Life Ins. Co.*, 553 F.2d 1026, 1031 (6th Cir. 1977) ("In making the determination of adequacy of representation the district court should consider the experience and ability of counsel for the plaintiffs and whether there is any antagonism between the interests of the plaintiffs and other members of the class they seek to represent." (citation omitted)).

Anthem again argues, with regard to both typicality and adequacy, that, "[b]ecause each treatment plan is unique, neither Plaintiff nor any other putative class member's claim could satisfy the typicality and adequacy requirements." [DN 41 at 33.] Moreover, as discussed above, Anthem claims that because Wilson herself did not pay the for the ABA therapy not covered by the Anthem Plan, her interest in litigating this case is not as strong as the other class members. [DN 41 at 24.] The Court disagrees.

With regard to the first criterion, Wilson has a clear common interest with members of the proposed class; that is, she "had the same benefit limits applied to her expenses for the treatment of ASD applied to her claims as other Class members. Thus, Plaintiff's interests are not antagonistic to those of the Class." [DN 38 at 22.] With regard to the second criterion, Wilson has demonstrated, through her diligent "prosecution of the litigation to date," that she "will continue to vigorously prosecute the claims of the class as a whole." *Young*, 693 F.3d at 543. The Court is unpersuaded that the mere fact that Wilson's mother helped cover the cost of the ABA treatment for which Anthem denied coverage renders her an inadequate representative.

22

Additionally, the Court finds that "class counsel [is] qualified, experienced and generally able to conduct the litigation." *Young*, 693 F.3d at 543 (quoting *Stout,* 228 F.3d at 717). Rule 23(g)(1)(A) specifically requires courts to consider:

> **(i)** the work counsel has done in identifying or investigating potential claims in the action;

> **(ii)** counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

> **(iii)** counsel's knowledge of the applicable law; and

> **(iv)** the resources that counsel will commit to representing the class;

Fed. R. Civ. P. 23(g)(1)(A). In his Declaration in support of Wilson's motion for class certification, Wilson's counsel of record, Robert Sparks, explains that his "practice principally involves consumer and insurance-related class action litigation, including litigation involving multi-state and nationwide classes, as well as other complex litigation locally and throughout the United States," and that he has "served as lead or co-counsel in a number of complex class actions." [DN 39 at 2.] Sparks further explains that he has "been involved in every aspect of this litigation, from the initial investigation and commencement of this action to the litigation of the claims asserted." [*Id.* at 3.] Sparks states that he has conducted factual investigation, formulated legal theories, and has invested significant time and research in this case. [*Id.*] He further declares that he is "familiar with the applicable law, including, but not limited to, insurance, ERISA, class certification law under Rule 23 of the Federal Rules of Civil Procedure, and the pertinent local and Sixth Circuit law." [*Id.*] Moreover, Sparks affirms his commitment "to devoting the skills end time necessary to bring this litigation to a successful resolution, and . . . to fairly and adequately representing the interests of the proposed Class." [*Id.*] Based upon these declarations, in addition to a review of Sparks' resume, and the litigation of this case thus far, the

23

Court finds that Sparks will adequately protect the interests of the proposed class as required under Rule 23(a)(4).

## II.     Rule 23(b) Categories of Class Actions

"In addition to meeting the requirements of Rule 23(a), a class must satisfy one of the categories of Rule 23(b)." *Young*, 693 F.3d at 544. "If the plaintiff's claim does not fall into one of these categories, class certification is inappropriate, even if the plaintiff meets each of Rule 23(a)'s four threshold requirements." *Davis*, 717 F.3d at 484. In the instant motion, Wilson alleges that certification would be proper under either Rule 23(b)(2) or Rule 23(b)(3). The Court will address each of these class action categories in turn.

### 1.     Rule 23(b)(2) Class Action

Wilson asserts, first, that certification is proper under Rule 23(b)(2), which is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). In *Dukes*, the Supreme Court explained that

> Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

*Dukes*, 564 U.S. at 360–61. Applying those principles, the Court held that, "a minimum, claims for *individualized* relief (like the backpay at issue here) do not satisfy the Rule." *Id.* at 360. The Court further, explained, in noting that the claims for backpay were improperly certified under Rule 23(b)(2), that its decision in *Ticor Title Ins. Co. v. Brown,* 511 U.S. 117, 121 (1994) *(per curiam)* "expressed serious doubt about whether claims for monetary relief may be certified

24

under [Rule 23(b)(2)]. We now hold that they may not, at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." *Id.* at 360. The Court reasoned that, as Wal-Mart would "have the right to raise any individual affirmative defenses it may have, and to 'demonstrate that the individual applicant was denied an employment opportunity for lawful reasons,'" the backpay determinations would be too individualized and therefore not "incidental" to injunctive or declaratory relief. *Id.* at 367 (citations omitted). Rather, the Court stated that it "think[s] it clear that individualized monetary claims belong in Rule 23(b)(3)." *Id.* at 362.

As stated in her Complaint, the relief Wilson requests for herself and members of the proposed class is 1) "immediate payment of past due benefits" and 2) the entry of an injunction to allow Wilson and the proposed class "to clarify and enforce their rights to payment of future benefits." [DN 1 at 14.] Wilson argues that her "request for monetary relief does not go beyond the benefits that would have been paid had Anthem not enforced its illegal policy of limiting benefits," and therefore that monetary "relief is incidental to . . . the requested injunctive relief." [DN 38 at 23.]

In response, Anthem asserts that, in determining damages in this case, "Anthem would have the right to show that, even if the caps of the Autism Mandate were unlawful with respect to *some* types of ABA therapy, Anthem acted lawfully in imposing the caps on other varieties that did not constitute 'mental health benefits' under the MHPAEA." [DN 41 at 38 (citing *Dukes*, 564 U.S. at 366–67).] The Court agrees. Wilson and the proposed class members seek reimbursement of the benefits they allege were improperly denied coverage. Repayment of these individual amounts is a primary purpose of the litigation, rather than a mere incidental result of injunctive relief, and the Court therefore finds that certification under Rule 23(b)(2) is improper.

## 2. Rule 23(b)(3) Class Action

Wilson further contends that the proposed class may be properly certified under Rule 23(b)(3), which authorizes certification when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These are known as the "predominance" and "superiority" requirements. In considering whether these requirements are met, pertinent factors may include:

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

### a. Predominance

"While the commonality element of Rule 23(a)(2) requires showing one question of law or fact common to the class, a Rule 23(b)(3) class must show that common questions will *predominate* over individual ones." *Young*, 693 F.3d at 544. However, success on the merits on those common questions is not required to satisfy the predominance requirement. *See In re Whirlpool Corp.*, 722 F.3d at 858 (quoting *Amgen*, 133 S. Ct. at 1191) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.")

In *Rikos*, the defendant, a manufacturer of allegedly ineffective probiotic supplements, opposed class certification, arguing "that scientific evidence might establish that [the probiotic] 'provides benefits for some purchasers, but not all—the exact middle ground Plaintiffs ignore,' and thus it would still be necessary to determine whether [it] works for each individual class member to prove injury, such that common issues do not predominate." *Rikos*, 799 F.3d at 519. The court rejected this argument, however, explaining that "under Plaintiffs' theory of liability," that is, that the probiotic did not work for *anyone,* "P & G's claim that Align works for some individuals goes solely to the merits; it has no relevance to the class certification issue." *Rikos*, 799 F.3d at 519 (citing *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 408 (S.D.N.Y. 2015)). The court further explained that "[t]he key point at the class-certification stage is that this kind of dueling scientific evidence will apply classwide such that individual issues will not predominate." *Id.* at 520. That evidence, explained the court, would yield "a common answer for the class based on Plaintiffs' theory of liability—whether [the probiotic] in fact has been proven scientifically to provide digestive health benefits for anyone." *Id.* The court additionally acknowledged that, even if the common answer to that question was that the probiotic "does work for some subsets of the class," that would "not transform this classwide evidence into individualized evidence that precludes class certification." *Id.*

The Sixth Circuit in *Young* also rejected a similar argument that individual issues predominated over common ones. The *Young* court explained that,

> [a]s in the commonality and typicality discussions, Defendants again urge that individualized inquiries are required. Defendants, in essence, argue that Plaintiffs cannot establish the causation element of their claims without reviewing the communications between each policyholder and insurance agent to decipher where the error originated. Defendants point to situations, such as the provision of incorrect information by a policyholder, which they claim relieve them of responsibility for an incorrect premium tax charge.

27

*Young*, 693 R.3d at 544. Like the *Rikos* court, the *Young* court held that "[t]hese potential individual inquiries do not defeat the predominance of common questions." *Id.* (citing *Powers v. Hamilton Cty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007)). The court explained that plaintiffs' theory in the case was that the "[d]efendants caused each class members' injury simply by failing to use . . . [adequate] processes," and, although the plaintiffs would "have to prove their theory at trial . . . for class certification, this [wa]s a predominate issue central to each of the [p]laintiffs' claims and subject to generalized proof." *Id.* at 544. Moreover, the court explained that "the district court would be free to revisit this issue at a later time if discovery shows that the number of policyholders whose tax overcharges are due to matters unrelated to the Defendants' actions is more significant than it now appears." *Id.* at 544–45 (citing *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 826 (7th Cir. 2012)).

Anthem's arguments in this case largely mirror those made by the defendants in *Rikos* and *Young*. Specifically, Anthem argues that individual, rather than common issues predominate in this case because

> [e]ach class member's cause of action would turn on whether the ABA therapy he or she received was a "mental health benefit," which would require mini-trials into what types of ABA therapy goals might be considered to provide mental health benefits as opposed to those associated with speech therapy, occupational therapy, vocational training, or behavior therapy services.

[DN 41 at 39.] In addition, Anthem contends that "each child's individual treatment goals would have to be compared to any other conditions he or she might have that might shed light on the nature of the therapy and its proper classification." [*Id.*] In essence, Anthem argues that a determination of whether its coverage limits for ABA therapy for each class member would require highly-individualized inquiries. [*See id.*] However, like the Sixth Circuit in both *Rikos*

28

and *Young*, we find that these arguments are directed toward the merits of Wilson's claim, and are therefore inappropriate at the certification stage.

Wilson's theory of liability in this case is that ASD is *always* a "mental health condition" as a matter of law, and therefore that Anthem's limitation of coverage for ABA therapy, a "mental health benefit" for *all* class members, violates the MHPAEA because Anthem does not impose like limitations on medical or surgical benefits. Certainly, Wilson will have to prove this theory at trial or at the summary judgment stage, but for purposes of class certification, these questions of law and fact are "predominate issue[s] central to each of [Plaintiffs'] claims and subject to generalized proof." *Young*, 693 F.3d at 544. Therefore, under Wilson's theory of liability, Anthem's claim that some of the caps it places on coverage of ABA therapy were *not* illegal go to the merits of Wilson's claims are not relevant to a finding of predominance. *See Rikos*, 799 F.3d at 519.

Of course, as the Sixth Circuit indicated in *Young*, this Court may see fit to revisit this determination if, after an examination of common legal questions at the summary judgment stage, it becomes clear that individualized inquiries into Anthem's denial of *each* class member's benefits is necessary. *See Young*, 693 F.3d at 544–45. *See also Rikos*, 799 F.3d at 520–21 (quoting *Daffin*, 458 F.3d at 554) ("If later evidence disproves Plaintiffs' contentions that common issues predominate, 'the district court may consider at that point whether to modify or decertify the class.'") At this stage, however, the Court is satisfied that common questions of law and fact predominate over individual questions.

### b. Superiority

In addition to predominance, a court must find, before certifying a Rule 23(b)(3) class action, that "a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Evid. 23(b)(3). "[C]ases alleging a single course of wrongful conduct are particularly well-suited to class certification." *Young*, 693 F.3d at 545 (citing *Powers,* 501 F.3d at 619; *Sterling,* 855 F.2d at 1197). And "where a threshold issue is common to all class members, class litigation is greatly preferred. *Id.* (citing *Daffin,* 458 F.3d at 554). However, "[w]here many individual inquiries are necessary, a class action is not a superior form of adjudication." *Id.* (citing *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 631 (6th Cir. 2011)).

Anthem makes two main arguments as to why a class action is not a superior method for resolving Wilson's claims. First, Anthem claims that, here "the putative class members have a significant financial incentive to file suit on their own behalf to recoup the allegedly wrongful coverage denials," especially when considering that "ERISA explicitly provides that the court may allow for the recovery of attorneys' fees and costs by either party." [DN 41 at 41 (citing 29 U.S.C. § 1132(g)(1)).] It is true, as Anthem points out, that the Sixth Circuit has explained that large individual recoveries "are not the types of awards that would preclude individual class members from seeking relief through litigation." *Pipefitters*, 654 F.3d at 632 (seeking recoveries of $280,000 and above); [DN 41 at 40.] Additionally, as Anthem points out, some "district courts within the Sixth Circuit have concluded that the presence of such fee-shifting provisions weigh against class certification, in that the financial barrier to bringing suit is eliminated." *Molina v. Roskam Baking Co.*, No. 1:09-CV-475, 2011 WL 5979087, at *6 (W.D. Mich. Nov. 29, 2011) (citing Michigan and Ohio District Court decisions).

In her reply, however, Wilson refutes Anthem's argument that there is a lack of financial barrier to other class members bringing suit. Specifically, Wilson opposes the argument "that because [she] has a significant amount of claims denied for having met the benefit maximum, all

30

other members of the class are in a similar position." [DN 44 at 11.] Rather, Wilson argues that, "[a]s indicated by the doubling of the class size in about a year, a number of individuals have come into the class recently and have not incurred a significant number of capped claims." [*Id.*] As several class members, especially the fifteen members who have most recently joined, may have had an insignificant number of claims capped, and therefore would seek relatively small recoveries, the Court is not persuaded each individual has such an incentive to bring suit so as to remove any financial barrier. However, should future discovery demonstrate that large number of class members have, like Wilson, claims for damages in the "tens of thousands," [DN 1 at 11], the Court can revisit the superiority requirement at that time. *See Young*, 693 F.3d at 544; *Whitlock, et. al. v. FSL Management, LLC, et. al.*, No. 16-5086, 2016 WL 7229828 (6th Cir. Dec. 14, 2016) (designated for publication) ("A district court 'retains the ability to monitor the appropriateness of class certification throughout the proceedings and to modify or decertify a class at any time before final judgment.'" (quoting *In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1261 (10th Cir. 2004)).

Moreover, Wilson identifies another factor that the Sixth Circuit has recognized as relevant to the superiority determination; that is, "the unlikelihood that many injured policyholders will discover, let alone attempt to vindicate, their injury individually." *Young*, 693 F.3d at 545. Wilson argues that if a class member who had their ABA benefits capped called the Kentucky Department of Insurance to inquire as to their denied claims, "he or she would be told that the limits were unassailable. In these circumstances, without a representative action class members would have little knowledge of the availability of a claim." [DN 44 at 5–6.] In other words, "many class members would not know that they have a claim for invalidating the benefits in the policy and in the Autism Mandate because of a federal mental health statute." [*Id.* at 12.]

31

Similarly, in *Young*, the court found that one factor weighing in favor of finding superiority was that "few policyholders are likely to be aware of their tax misassignment." *Young*, 693 F.3d at 545. *See also Whitlock v. FSL Mgmt., LLC*, No. 3:10-CV-00562, 2012 WL 3274973, at *13 (W.D. Ky. Aug. 10, 2012), *aff'd*, 2016 WL 7229828 (Dec. 14, 2016) ("[G]iven the fact that recovery of many of the potential class members may be relatively small and that many of the class members may not be aware that they have a claim, the interest of individual class members in maintaining separate actions is also small.") The Court agrees with Wilson that this factor also weighs in favor of finding a class action the superior method for resolving this dispute.

Second, Anthem contends that the individualized inquiries it asserts are necessary in this case regarding ASD and ABA present "difficulties in managing a class action" and "eliminate[e] any judicial efficiencies that might come from class treatment." [DN 41 at 42.] As it maintains throughout its response, Anthem states that "resolving the merits of each of the putative class members' claims will entail detailed, individualized determinations regarding the nature of the ABA therapy for which the class member sought coverage from Anthem." [*Id.*] Anthem contends that the defenses it would present against each class member would hinder, rather than serve, judicial economy. [*Id.* at 33.]

To the contrary, however, the Court finds that because there are "threshold issue[s] . . . common to all class members, class litigation is greatly preferred." *Young*, 693 F.3d at 545 (citing *Daffin,* 458 F.3d at 554). Specifically, common threshold issues in this case include whether ASD is a "mental health condition" as a matter of law, whether ABA therapy is a "mental health benefit" as a matter of law, and whether, as a result, Anthem's limitations on ABA therapy are illegal as applied to all class members a matter of law. Therefore, the Court is persuaded that "litigating the existence of a common policy or practice for the class as a whole

would 'both reduce the range of issues and promote judicial economy.'" *Whitlock*, 2012 WL 3274973, at *13 (quoting *Dodge v. County of Orange,* 226 F.R.D. 177, 184 (S.D.N.Y. Jan. 27, 2005)). The Court agrees that "concentrating the litigation of the claims in" one forum is preferable.   Fed. R. Civ. P. 23(b)(3)(C). Moreover, both parties concede the lack of any "litigation concerning the controversy already begun by . . . class members." Fed. R. Civ. P. 23(b)(3)(C); [DN 38 at 25; DN 41 at 16.] Balancing the pertinent factors, the Court is persuaded that a class action is the superior method to fairly and efficiently adjudicate this controversy.

## III.    Class Definition

Having determined that a class is properly certifiable under Rule 23(b)(3), the Court must address the proposed class definition. "Although not specifically mentioned in [Rule 23], the definition of the class is an essential prerequisite to maintaining a class action." *Brockman v. Barton Brands,* 2007 WL 4162920 at *2 (W.D. Ky. 2007) (internal citations omitted). The class description must be "sufficiently definite that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* Plaintiff has proposed the following class definition:

> All persons who are or have been insureds, participants in, or beneficiaries of a health insurance policy issued or administered by Anthem Health Plans of Kentucky, Inc., which contains dollar limits on the provision of treatment for Autism Spectrum Disorders and who have made a claim for, and have been denied coverage or reimbursement for Applied Behavior Analysis treatment for Autism Spectrum Disorders on the grounds that the policy's dollar limits had been exceeded.

[DN 38 at 2.] Because, as Wilson points out, the dollar limits in Anthem's policy were "later converted to an hour limit, but with the identical effect," [*Id.* at 11], the Court finds it necessary to add the phrase "hour limits" into the class definition.   Accordingly, the Court will slightly amend Wilson's proposed definition to read as follows:

33

All persons who are or have been insureds, participants in, or beneficiaries of a health insurance policy issued or administered by Anthem Health Plans of Kentucky, Inc., which contains dollar or hour limits on the provision of treatment for Autism Spectrum Disorders and who have made a claim for, and have been denied coverage or reimbursement for Applied Behavior Analysis treatment for Autism Spectrum Disorders on the grounds that the policy's dollar or hour limits had been exceeded.

## IV.     Plaintiff's Motion to Strike

Wilson additionally filed a Motion to Strike Undisclosed Evidence and Testimony she alleges was included in Anthem's response in opposition to her motion for class certification. [DN 43.] This includes "(i) the Declaration and testimony of Anthem's undisclosed witness, Pamela Kroger (Doc. 41-5), (ii) the Declaration and testimony of Anthem's undisclosed expert witness, Joy Lynn Waganer (Doc. 41-1), and, (iii) the undisclosed selective medical records from just 2 of 27 class members (Docs. 41- 2 & 41-3, Exhibits B & C)." [*Id.* at 1.] Wilson alleges that, as these materials were not disclosed by Anthem during discovery, they should be stricken pursuant to Rule 26 and Rule 37(c)(1) of the Federal Rules of Civil Procedure. [*Id.* at 5.] Anthem filed a detailed response arguing that such evidence and testimony should not be stricken. [DN 45.]

As the Court has considered this evidence and testimony in making its decision regarding class certification and is nonetheless granting Wilson's motion to certify, the Court will deny Wilson's motion to strike portions of the evidence and testimony included in Anthem's response as moot. Should a lack of disclosure later present evidentiary issues, however, Wilson is free to bring those issues to the Court's attention at that time.

CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED:**

34

I.      Plaintiff's Motion for Class Certification [DN 37] is **GRANTED.**

II.     Plaintiff's counsel, Robert R. Sparks and Strauss Troy Co., L.P.A., is appointed class counsel pursuant to Rule 23(g).

III.    The certified class is defined as follows:

All persons who are or have been insureds, participants in, or beneficiaries of a health insurance policy issued or administered by Anthem Health Plans of Kentucky, Inc., which contains dollar or hour limits on the provision of treatment for Autism Spectrum Disorders and who have made a claim for, and have been denied coverage or reimbursement for Applied Behavior Analysis treatment for Autism Spectrum Disorders on the grounds that the policy's dollar or hour limits had been exceeded.

IV.     Plaintiff must submit for the Court's approval, within fourteen (14) days of the issuance of this Order, a proposed notice for notifying class members of the instant action in accordance with the requirements of Rule 23(c)(2)(B). Defendant shall have seven (7) days after the filing of Plaintiff's proposed notice to file objections thereto.

V.      Plaintiff's Motion to Strike Undisclosed Evidence and Testimony [DN 43] is **DENIED as MOOT.**

cc:     Counsel